IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>HANDL NEW YORK, LLC,<br><br>             Debtor. | Chapter 11<br>Case No. _____ |

## DECLARATION OF ALLEN HIRSCH IN SUPPORT OF FIRST-DAY PLEADINGS

Allen Hirsch, the Co-CEO and principal manager of HANDL New York, LLC (the "Debtor"), debtor and debtor in possession in the above-captioned case, makes this declaration in accordance with 28 U.S.C. § 1746:

1.    The Debtor has filed various motions and applications in this case, and this declaration is executed to provide factual support to support them. The statements made in this declaration are made upon personal knowledge, except where expressly indicated otherwise, and upon my inspection of certain books and records of the Debtor.

2.    This declaration is divided into two parts. First, I will provide a factual background to the Court and the parties to establish a context and explanation of the Debtor and its financial affairs. Second, I will provide factual support for specific individual motions and applications filed by the Debtor.

             I.    BACKGROUND

3. On June 30, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has managed its affairs as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4. The Debtor is the supplier of high-end cell phone cases and attachable phone holders and stands. The Debtor is a Delaware limited liability company with two members: a 99% interest owned by Allen Hirsch ("Hirsch"), the inventor and designer of the cases and—until recently—a relatively passive officer of the company and a 1% interest owned by The Identity Group LLC ("TIG"), which assumed the operational role of the company. The understanding between the partners was that Hirsch—who has an artistic background—would serve as the creative partner while TIG would handle the business-related activities. TIG would get a portion of the distributions and gain equity based on sales benchmarks. Hirsch contributed to the Debtor certain rights that he held in some trademarks and patents for products to be manufactured by the Debtor. The operating agreement governing the Debtor (the "Operating Agreement") provides Hirsch with a deadlock breaking vote for most kinds of management decisions. Brad Satz of TIG, whose title was also Co-CEO, took control of the day-to-day operations of the Debtor on or about November 1, 2018.

5. Initially TIG caused the Debtor to enter into an Exclusive Distribution, License and Manufacturing Agreement (the "C2 Distribution Agreement") with a distributor called C2 Wireless & Accessories, Inc. ("C2") whereby C2 received the exclusive right and license to distribute the Debtor's products. TIG caused the Debtor to enter into the C2 Distribution Agreement without the knowledge and consent of Hirsch.

6. Less than six months later, and also without the knowledge and consent of Hirsch (required under the Operating Agreement), TIG caused the Debtor to enter into a Termination, Settlement, and Release Agreement (the "C2 Termination Agreement") with C2 effective as of April 17, 2019. To the best of my ability to understand the C2 Termination Agreement, C2 released its license to exercise exclusive control of the sale of the Debtor's products, treated the remaining inventory (which C2 had allegedly purchased pursuant to the C2 Distribution Agreement) as consigned goods, and received a blanket security interest on substantially all of the Debtor's assets to secure the Debtor's remaining obligation to cover C2's out of pocket cost of inventory. On April 18, 2019, C2 recorded a UCC-1 financing statement. The Debtor's records reflect that the initial amount due to C2 was $700,000 but as of the Petition Date has been reduced significantly based on C2 sales of its inventory. However as of the Petition date, C2 has not provided an accounting of this amount despite demand.

7. The Debtor believed its products were in demand by numerous big-name retailers such as Verizion, ATT and Staples, but no marketing dollars were available to help promote the products in their stores and sales stagnated. New capital financing was required to manufacture, store, deliver, and promote products to market. Based on a connection from Mr. Satz from TIG, new products were developed and inventory was financed by Argento, S.C. ("Argento") on a delivery-by-delivery basis without a formal written agreement. The Debtor was assured that Argento would make a $500,000 investment but only $170,000 was paid by mid 2020.

8. Apparently believing it would be well capitalized by Argento's representation that it would invest $500,000, Mr. Satz caused the Debtor to rent an expensive office and to hire staff. These decisions proved disastrous. COVID hit in mid-March. Even though its sales increased, the Debtor struggled to maintain its overhead. As the year progressed, sales increased but the Debtor struggled with paying its staff and meeting its obligations to Argento, which required 25% of net profits paid in return for its financing of inventory and general assistance.

9. By October 2020, the Debtor had no money even to pay basic credit card bills and it even defaulted on its American Express cards. Argento kept paying for inventory and cost of goods to the tune of almost $1 million but put no more money into the operations of the company. The Debtor's sales at fiscal year

end January 31, 2021 were approximately $1,373,000 but was running at approximately a $343,000 loss.

10. On or about December 22, 2020, believing it could lock Argento into an obligation to provide more investment and goodwill, the Debtor entered into a Joint Venture Agreement (the "JV Agreement") with Argento, whereby Argento agreed to provide the Debtor with "establishing relationships with Manufacturers in China (or alternate manufacturing facilities in the future) and alternative inventory financing options (e.g. introduction to banks and other potential lenders)," some logistics support, and "[a]t its option and in its sole discretion" to provide financing. There were no provisions in the JV Agreement giving Argento a lien or security interest in any assets of the Debtor.

11. Realizing that the Debtor's finances were in true distress, Hirsch became more active in overseeing TIG's management of the Debtor at the beginning of 2021. At this time he discovered various inefficiencies in manufacturing and staffing, as well as the Debtor's rising debt in spite of the increase in sales.

12. Although both Argento and TIG were aware of this obligation, on April 19, 2021, Mr. Satz learned that Hirsch intended to cause the Debtor to make a $60,000 arbitration settlement payment to a creditor that was due on April 20, 2021. Mr. Satz informed Argento—which is managed by a friend of Mr. Satz—

about this and Argento promptly sent a payment demand letter to Mr. Satz seeking the maximum amount immediately due by the Debtor to Argento. Without Hirsch's knowledge or authorization (as required under the Operating Agreement), Mr. Satz then preempted the creditor payment that Mr. Hirsch intended to make by causing the Debtor to make a payment in the amount of $182,281 to Argento. This was all of the Debtor's available cash and Mr. Satz presumably made this payment to ensure that Argento received preferential treatment instead of the cash being used for other purposes (such as a PPP loan to pay employees). This payment left the Debtor with no liquidity. The Debtor was then forced to let all of its employees go on or about April 28, 2021. Argento, however, now insisted that it would not advance further financing, and would commence collection, unless it received onerous protections from the Debtor for its existing debt.

13. Unbeknownst to Hirsch at the time, a shipment from China of critical merchandise for the Debtor's two biggest U.S. retailers was at port and the Debtor could not pay the balance due to release it. Argento had agreed to finance this inventory but was now refusing to pay the balance unless the Debtor signed an agreement to give Argento extensive protections, including but not limited to a "first-priority" lien on the Debtor's assets. On top of this, the warehouse where the Debtor stores its inventory is owned by Replay Storage Solutions, the principal of which is the father of Jack Scaba of Argento. Not surprisingly, the warehouse

suddenly and unjustifiably refused to fulfill orders on the Debtor's website and Amazon. This paralyzed the Debtor's ability to operate its business, threatened its primary retail relationships, and prevented the Debtor from being able to make further payments due to Argento.

14. Argento then demanded numerous draconian protections including having sole control of Debtor's bank account to withdraw all its invested money (including the equity payments and now asserted to be $924,225) plus approximately $135,285 for profits due as funds came into the company. It made threats of lawsuits against the Debtor and even baseless threats against Hirsch personally, as well as intimating an intention to file a petition against the Debtor for involuntary bankruptcy relief. The Debtor—now led directly by Hirsch—feeling that the business had no choice, finally agreed to provide Argento with most of the requested protections—including but not limited to a broad blanket lien—as a last ditch effort to prevent the Debtor's loss of its principal retail relationships and complete financial collapse.

15. The Debtor's agreement to these protections signed on June 2, 2021 was delivered upon the express condition that Argento would immediately finance the inventory in port and release HANDL inventory from the warehouse to ship to

retailers. As far as I am aware, Argento did not make further payments,[1] but the agreement left the Debtor with no money to operate its business and because Argento controlled its bank account, the Debtor had no way of assuring that its operational obligations could be met. This bankruptcy ensued.

## II. FACTS RELATING TO SPECIFIC MOTIONS

16. In this section, I provide factual support for specific individual motions and applications filed by the Debtor in this case.

### A. CASH COLLATERAL MOTION.

17. The Debtor has filed a Motion For Entry Of Order Approving Use Of Cash Collateral and Determining That Creditor Is Adequately Protected, Or, In The Alternative, Providing For Adequate Protection of Creditor's Interest in Collateral (the "Cash Collateral Motion").

18. On the Petition Date, the Debtor may have had, and may also acquire, property of the estate in which C2 and Argento (the "Secured Parties") may assert an interest ("Collateral"), including but not limited to certain of its cash ("Cash Collateral").

19. I believe that during this case, the Debtor will need to use the Collateral to generate income for the estate, including but not limited to its Cash Collateral. Absent the use of Cash Collateral, the Debtor will not be able to protect

---

[1] The cargo was released on or about June 15, 2021 and the warehouse started processing the shipments, but to the best of the Debtor's knowledge, this had nothing to do with Argento.

the Collateral, and its estate, and its creditors will suffer immediate and irreparable harm.

20. By the Cash Collateral Motion, the Debtor is requesting that the Court approve, on an interim and final basis, the Debtor's use of Cash Collateral pursuant to the terms and conditions of the proposed order appended hereto.

21. The Debtor seeks authorization to use Cash Collateral to fund the payment of any expenses incurred by the Debtor after the Petition Date in accordance with the Budget (as defined in the Cash Collateral Motion), which I prepared. The primary uses of Cash Collateral will be to maintain existing inventory, to pay for the production and shipping of new inventory, and to pay the bankruptcy administrative expenses such as professional fees and fees payable under 28 U.S.C. § 1930. I believe that the inability of the Debtor to use Cash Collateral would have a materially adverse effect on its estate and creditors. The ability of the Debtor to remain a viable entity and to reorganize under Chapter 11 of the Bankruptcy Code therefore depends upon obtaining the relief requested herein.

22. Furthermore, I believe that the use of Cash Collateral will protect the Secured Parties' other Collateral. The purpose of this bankruptcy is to create sufficient liquidity to produce more inventory, leading to further sales. This directly inures to the Secured Parties' benefit.

23. According to the Debtor's books and records, C2's claim is approximately $200,000, while the value of the Debtor's inventory is approximately $214,911. The documents governing C2's claims do not provide for interest or finance charges, so the amount of C2's claims is not increasing.

24. Moreover, according to the prepetition documents creating C2's liens, C2 holds certain inventory under a complex consignment relationship which, to the best of my understanding, C2 may sell in order to pay down the amount of its claims against the Debtor. This provides C2 with additional protection of its claims secured by the Collateral, including but not limited to the Cash Collateral.

25. In this case, I believe that C2 is oversecured, because the value of the Collateral (plus the amount of excess inventory in C2's possession that it sells to pay down its claim against the Debtor) was higher than the amount of C2's debt as of the Petition Date. Because the amount of the debt is not increasing and the tangible Collateral will be sold for its fair market value, C2's interest in the Collateral is protected. Except for administrative expenses, the Debtor will conserve its cash from sales until a plan can be filed and confirmed.

26. I have reviewed the expenditures reflected in the Budget and I believe that they are actual, necessary expenses for maintaining the Collateral, as well as the administrative expenses associated with this bankruptcy. Insofar as C2's claim appears to have been fully secured on the Petition Date and the value of the

Property has not changed considerably since the Petition Date, it should not be necessary for the Debtor to make payments to the C2 to account for any diminution in value of the Collateral.

27. On the other hand, I am advised that a lien which is not perfected and/or which may have attached within the 90 days before the bankruptcy filing date may be avoidable. If necessary or appropriate, I will cause the Debtor seek to avoid the lien of Argento, which appears to hold a second lien in the Collateral. I have ordered a report and learned that Argento did not file a UCC-1 financing statement in connection with its lien, and I signed that lien documents fewer than 90 days before the Petition Date. Therefore, the Debtor submits in the Cash Collateral Motion that Argento's lien is not entitled to any protection.

B.  CRITICAL VENDOR MOTION.

28. The Debtor has filed a Motion for Authority To Pay Critical Vendors (the "Critical Vendor Motion"), seeking authority to pay certain critical vendors on account of their prepetition claims. Specifically, the Debtor seeks to pay:

| Vendor Name | Services Provided | Est. Claim To Be Paid |
|---|---|---|
| Replay Storage Solutions | Warehouse | $21,414 |
| Siyan Industrial (Dong Guan) Co., Ltd | Manufacturing | $56,160 |
| T&F Industrial Limited | Manufacturing | $3,000 |
| Table Mountain Sales | Manufacturing | $3,000 |
| Powerplay Marketing Group | Amazon management | $3,000 |

| Hoffman Patent Firm | IP Legal assistance | $22,176 |

(each a "Critical Vendor," and collectively, the "Critical Vendors").

29. It is imperative that the Debtor's operation begin again as soon as possible. Whether the Critical Vendors are entitled to withhold the services they perform to the Debtor notwithstanding the automatic stay, the Debtor requires that their services begin as soon as possible and continue uninterrupted until during the pendency of this case. The Debtor is therefore requesting authority but not direction to pay Critical Vendors some or all of their prepetition claims (each a "Critical Vendor Claim," and collectively, the "Critical Vendor Claims") under the terms and conditions set forth in that motion.

30. The Debtor asserts that certain of the relief requested in this Motion is essential to the Debtor's ongoing operation and therefore requests that the Court enter an interim, emergency Order in connection with this motion (the "Interim Order"). Thereafter, the Debtor requests that the Court conduct a hearing on notice on the relief requested in this Motion and enter a final order hereupon (the "Final Order," and with the Interim Order, the "Orders").

31. I believe that the goods and services provided by the Critical Vendors are vital to the Debtor's continuing business operations, and that the failure to pay the Critical Vendor Claims may have a material adverse impact on the day-to-day operations of the business and would very likely disrupt the Debtor's ability to

continue to operate during this Chapter 11 case. If certain Critical Vendors are unwilling to provide goods or services postpetition or enter into new or renewed arrangements with the Debtor because of unpaid prepetition claims, then the Debtor's operations will materially suffer, compromising the value of the Debtor's estate to the detriment of all creditors.

32. In my opinion, all of the Critical Vendors listed above other than the Hoffman Patent Firm may need to be paid immediately or else there will be a serious disruption to the Debtor's ability to order, store, and sell new product. The amounts stated are approximate, but the Debtor requests authority to pay up to 150% of the amounts stated in the chart above (but not to exceed the actual prepetition amounts owed) to all Critical Vendors except the Hoffman Patent Firm on an emergency basis. The Debtor will pay, on an emergency basis, only so much of the Critical Vendor Claims as will be necessary to maintain normal operations until the Court may conduct a final hearing on this motion.

33. The maintenance of the Debtor's businesses during this Chapter 11 case is crucial to the Debtor's ability to preserve its business as a going concern, which provides enhanced value for the benefit of all of the Debtor's stakeholders.

34. The Debtor is not seeking authority to pay all Critical Vendor Claims immediately, but only in its discretion to pay in the ordinary course of business undisputed amounts that come due on terms consistent with prepetition practice.

Thus, I believe the relief requested is narrowly tailored to and consistent with the paramount goal of Chapter 11 to preserve value by facilitating the continued operation and rehabilitation of the debtor.

35. Here, the relief sought is vital for the Debtor's successful reorganization. If the Debtor cannot pay the Critical Vendors, the negative impact would likely be almost immediate as certain of the Critical Vendors, on which the Debtor depends, may immediately withdraw services and cease to provide necessary goods. Such an occurrence would impair a successful reorganization and hamper viability following the Debtor's emergence from this Chapter 11 case.

36. Further, certain of the Critical Vendors may be in possession of Debtor's tooling and may have integrated it into the manufacturing process. Locating replacement vendors would require months and cost the Debtor valuable resources to recreate the tooling needed to produce the Debtor's inventory. The Debtor is thus ill-equipped or unable to switch to other vendors or suppliers on short notice and therefore faces significant risk if certain prepetition amounts cannot be paid. Accordingly, the Debtor has concluded that if it does not pay the Critical Vendors, the value of the Debtor's estates may be reduced by amounts in excess of the amounts that the Debtor seeks authorization to pay through this Motion.

37. In addition, maintaining favorable trade terms with the Critical Vendors is in the best interests of all parties in interest in this Chapter 11 case. In particular, the Critical Vendor Motion enables the Debtor to condition providing payments on account of prepetition Critical Vendor Claims on Critical Vendors agreeing to continue to provide goods or services on Customary Trade Terms (as defined in the motion) or other accommodations deemed acceptable to the Debtor in its business judgment. It also gives the Debtor the flexibility to require vendors to enter into Trade Agreements to ensure those terms are maintained. Maintaining such favorable trade terms will avoid unnecessary expense during this Chapter 11 case. Further, not only will it prevent the disruptions caused by attempting to replace essential providers of goods and services, but also the detrimental impact of having to acquire goods and services on worse terms at all. In turn, the Debtor will be able to preserve liquidity and ensuring that it is better positioned to sustain operations while reorganizing. Such terms may also allow the Debtor to avoid the inherent operational inefficiencies of paying cash on demand and managing billing processes for vendors that might require cash in advance or shorten their payment terms if the Debtor fails to pay amounts that accrued prepetition in the ordinary course of business.

38. As more fully described above, I believe that immediate and irreparable harm would result without the relief requested herein because failure to

pay the Critical Vendors could result in such vendors refusing to provide essential goods and services to the Debtor thereby operations and causing lasting damage to their customer and partner relationships. This needless disruption to the Debtors' business and added risk to the success of their operations can be avoided if the Debtor is permitted to pay Critical Vendors. For these reasons, the Debtor submits that the relief requested in the Orders is essential to prevent immediate and irreparable harm to the Debtors' operations and preserve the ongoing value of the Debtor's business and thus stakeholder recoveries.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: 6/30/2021

ALLEN HIRSCH